UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DONALD L. HYATT, II,           *
MARSHALL A. HYATT,             *
and JOHN D. HYATT, M.D.        *     CIVIL ACTION
                  PLAINTIFFS   *
                               *     NO. 2:13-cv-06328
           VERSUS              *
                               *     JUDGE MARTIN FELDMAN
LAVERN D. ROVIG, IFC HOLDINGS, INC.,   *
and JACKSON NATIONAL LIFE INSURANCE    *     MAG. JUDGE ROBY
COMPANY                        *
                  DEFENDANTS   *
                               *
*    *    *    *    *    *    *    *

**MEMORANDUM IN OPPOSITION TO
12(B)(6) MOTION TO DISMISS, OR ALTERNATIVELY
TO STAY AND COMPEL ARBITRATION**

MAY IT PLEASE THE COURT:

The defendants, Lavern D. Rovig, IFC Holdings, Inc., and Jackson National Life

Insurance Company, seek dismissal of all claims based on arguments that in places are simply

based on scant authority. In other areas of their argument, particularly with regard to the

Louisiana Unfair Trade Practice Act (LUTPA) claim, their argument is at best a misstatement of

the current state of the law and at worst a misrepresentation to the Court of the current rule of

law by the device of ignoring a seminal change in Louisiana Supreme Court law concerning this

state law claim. With regard to the LUTPA claim, not only has the fundamental rule of law relied

upon by the defendants changed, but that change has been firmly recognized and applied by this

Honorable Court. Finally, with regard to the attempt to urge that arbitration is mandated by the

contract between the plaintiffs' late father, Donald A. Hyatt, and IFC Holdings, Inc., the

defendants' argument does not comport with controlling Fifth Circuit precedent, which has also been applied by this Honorable Court.

Based on the declaration or affidavit of Mr. Forbush that Jackson National is not the insurer of the other defendants, the plaintiffs do not object to a dismissal of Jackson National.

## I.  Factual Background

Plaintiffs' father, Donald A. Hyatt, purchased a Prudential annuity product from Mr. Rovig, who was at all times relevant to this matter an agent for IFC Holdings, Inc. d/b/a INVEST Financial ("IFC"). Donald A. Hyatt entered into agreements to allow Mr. Rovig to act for him as his investment adviser. These agreements contain an arbitration clause, discussed in detail below, that is at issue.[1]

In early 2011, Donald A. Hyatt was diagnosed with liver cancer. At the time he was married to and living with Dr. Mary E. McWilliams in Shreveport. (The plaintiffs' mother, Donald A. Hyatt's first wife, Sally Mary Williams Hyatt, had died in 1993.) After undergoing initial liver cancer treatment, and while undergoing in-patient treatment for alcohol abuse, Dr. McWilliams made false statements to the undersigned concerning his father's mental health. Specifically, Dr. McWilliams, a neurologist, stated that the staff at the hospital he was being treated at had opined that he was permanently suffering alcoholic dementia at that time. Upon hearing this, the undersigned contacted the hospital and his father, and learned that the statement

---

1   The recitation of the facts is, by obvious limitation of the brief length limit, abbreviated. For a more detailed understanding of the chronology, the Court's attention is respectfully directed to two detailed emails, both attached to the Complaint as exhibits. Exhibit L is a chronology of events sent to Mr. Rovig the same day that he revealed that Dr. McWilliams was the named beneficiary of the death benefit. (R. Doc. 1-12.) Despite being asked to correct any errors, Mr. Rovig has never indicated that there is any factual error in that chronology. Also, in this email and some others the Court may note reference to Mr. Rovig as "Gen. Rovig." He is a retired general. Later, when the claim at issue was presented to IFC on the off chance that they might actually pay for their agent's error, a detailed statement of the history was submitted. It is attached to the Complaint as Exhibit P. (R. Doc. 1-16.) Read in combination, these two emails give a fairly detailed rendition of the factual history at issue. For the convenience of the Court duplicates of these two exhibits are being attached hereto.

by her was false. This resulted in Donald A. Hyatt being released to the care of plaintiffs and moving to Mandeville. It also resulted in Donald A. Hyatt and Dr. McWilliams being divorced.

Donald A. Hyatt gave the undersigned a durable power of attorney, but instructed that it was to be used sparingly until he was disabled. In March of 2012 the undersigned, after some decline in his father's health, initially contacted Mr. Rovig. Mr. Rovig was given a copy of the POA and agreed to honor it. He also agreed to keep the undersigned informed of any important issues concerning Donald A. Hyatt's finances.

During the remainder of 2012 a number of transactions were carried out on the authority of the POA. Mr. Rovig recommended to the undersigned that an account containing about $28,000.00 that was the residue of Sally Hyatt's estate be liquidated to provide cash for use supporting Donald A. Hyatt's care. The reason for liquidating this asset first, according to Mr. Rovig, is that it would simplify the probate issues, as Donald A. Hyatt has usufruct of it and the plaintiffs had naked ownership of it. Once it was liquidated the only remaining substantial financial asset was to be the annuity, and the death benefit from it would, according to Mr. Rovig's statements in conversation, be paid to the plaintiffs as a death benefit treated as a life insurance payment.

As Donald A. Hyatt's condition deteriorated, he entered hospice on January 16, 2013. At that time the undersigned sought any appropriate advice from Mr. Rovig both to ensure cash availability for the remainder of his father's life and any adjustments that would ease estate processing. Critically, on January 26, 2013, the undersigned specifically called to make certain that no money, particularly the death benefit would go to Dr. McWilliams. Mr. Rovig assured the undersigned that the plaintiffs were the beneficiaries of the death benefit, not Dr. McWilliams.

He further assured that he would check the paperwork and contact the undersigned if there was any problem with the status of the death benefit.

Donald A. Hyatt died on March 16, 2013. In emails after Donald A. Hyatt's death Mr. Rovig continued to maintain that the plaintiffs were the named beneficiaries for the death benefit, and all that was needed was some simple paperwork once the death certificate was obtained. Once the death certificate was obtained, however, the entire story changed, and now it was determined that Dr. McWilliams, who had lied about Donald A. Hyatt's mental status and sought agreement from the undersigned based upon that falsehood to have him placed in an institution or hospital for the entirety of his remaining time alive . . . . and who when her ruse did not work divorced him, was the sole beneficiary. She also happened to be another customer of Mr. Rovig's.

Undercutting any notion that Mr. Rovig thought Dr. McWilliams was really intended to receive the death benefit is the purported effort by Mr. Rovig to get her to disclaim the benefit. Even more damning is his admission in an email on 4/11/2013 that "I am damned mad at the whole shootin match and feel that I have really let your Dad and you boy's [sic] as well." (Ex. N, R. Doc. 1-14.) As is oft the case, admissions of liability or error are suddenly modified when demand is made for compensation for the injuries. In this case, once IFC's Surveillance and Dispute Resolution Unit was involved, claims of never before mentioned conversations between Rovig and Donald A. Hyatt were brought forward to exculpate Rovig from any liability. This litigation resulted.

## II.     Applicable Rules of Decision for a Fed. Rule Civ. P. 12(b)(6) Motion to Dismiss

The standards for evaluation and consideration of a FRCP 12(b)(6) motion are well established and will only be briefly illuminated herein.

In evaluating a complaint when a plaintiff is faced with a FRCP 12(b)(6) motion to dismiss all factual allegations must be accepted as true. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). The complaint must be considered in its entirety, along with any documents attached to and referred to in the complaint. Tellabs, 127 S.Ct. at 2509, Collins v. Morgan Stanley Dean Witter, 224 F3d 496, 498-499 (5th Cir. 2000). Documents referred to, attached to the complaint, and relied upon in the framing of a complaint, particularly a fraud complaint, may be considered by the Court due to actual notice and context given to any statements taken from the documents through their attachment, as opposed to consideration of documents improperly referred to in an opposition to a motion to dismiss which are not attached and referred in the complaint. See In re: Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3rd Cir. 1997).

**III.     Under the Particular Facts a Negligent Misrepresentation Claim Has Been Stated**

Mr. Rovig made negligent misrepresentations on two critical occasions, when he suggested that it would be to the advantage of the plaintiffs to liquidate the one remaining asset remaining in their mother's estate, and more critically, when he advised that the plaintiffs were already named as the beneficiaries to the death benefit for the Prudential annuity held by Donald A. Hyatt. As can be seen in the email exchanges after the death of Donald A. Hyatt, he has acknowledged his failure to give accurate information, but nonetheless resists taking financial responsibility for his errors, as does IFC, for whom he was an agent at the time of the relevant events.

The elements of a negligent misrepresentation claim include, "(i) a legal duty to supply to correct information, (ii) a breach of that duty, (iii) which caused damage to the plaintiff." Ducote Jax Holdings, L.L.C. v. Bradley, 2007 WL 2008505 (E.D.La. 7/5/2007) (Fallon, J.), citing,

Cypress Oilfield Contractors v. McGoldrick Oil Co., Inc., 525 So.2d 1157 (La. App. 3 Cir., writ denied, 530 So.2d 570 (La. 1988); Barrie v. V.P. Exterminators, Inc., 6275 So.2d 1007,m 1013-1014 (La. 1993).

The first argument advanced by defendants is that neither Mr. Rovig nor IFC owed any duty to provide correct information. (R. Doc. 11-1 at 5.) The defendants urges this position at two levels. Defendants argue that there was no duty to provide the plaintiffs correct information as there was no privity or relationship between the plaintiffs, as intended beneficiaries, and Rovig or IFC. At another level, Rovig and IFC contend that even if the claim were asserted on behalf of the estate of Donald A. Hyatt, Rovig and IFC owed him no duty, relying on the detailed facts of Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 530 (5th Cir. 1987).

The Romano case, just based on the facts recited by defendants in their brief, is readily distinguishable as a situation in which no duty was owed because the plaintiff was "an alert and vigilant businessman who daily received and assessed the silver futures market." (R. Doc. 11-1 at 5, citing, Romano, 834 F.2d at 530. It is difficult to imagine or conceive of a situation further from the financial scenario in the present matter in which a very ill, elderly man, dying of liver cancer and invested principally in an annuity contract relies upon his investment adviser for information from time to time. If Mr. Rovig and IFC are not more discerning of the distinctions between their clients than the distinction between the situation in Romano and the present matter, the paradigmatic issues presented transcend the liability issues in this matter.

Returning to the present matter, Mr. Rovig and IFC owed a duty to the plaintiffs because Mr. Rovig, acting in his capacity as agent for IFC, assumed the duty of providing correct information to the plaintiffs. Louisiana has long recognized that an individual could assume a tort duty to provide accurate information by providing information voluntarily for reliance by a

person or entity not in privity with the information provider. See Trust Co. of Louisiana v. N.N.P., Inc., 104 F.3d 1478, 1487-1488 (5th Cir. 1997); Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co., Inc., 525 So.2d 1157, 1162 (La. App. 3rd Cir. 1988); Payne v. O'Quinn, 565 So.2d 1049, 1054 (La. App. 3rd cir. 1990); Pastor v. Lafayette Bldg. Ass'n, 567 So.2d 793, 796 (La. App. 3rd Cir. 1990). In accepting and recognizing the tort of negligent misrepresentation, a duty is owed despite the absence of privity when the information is directly transmitted to the user of the information, in this case the undersigned. Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1015 (La. 1993). Plaintiffs properly alleged this assumption of duty, thereby satisfying the duty element, when it was specifically alleged that Mr. Rovig assumed such a duty through the providing of advice and information concerning who was named as the beneficiary for the death benefit and the provision of advice that it would make the handling of the estate matters easier for the plaintiffs if the funds remaining in their late mother's estate were depleted first. (Complaint at ¶43, R. Doc. 1 at p. 16.)

With regard to the remaining two elements, breach and damage caused by the breach, there can be little doubt that they have been properly alleged. In paragraphs 17, 20, 25 and 44, the details are given of Mr. Rovig providing inaccurate information as to the beneficiary status of the plaintiffs and their reliance on that information to neither seek a change in beneficiary designation by their father while he was still alive or use the durable POA to simply transfer the funds from the Prudential annuity into his bank account, which would have caused the funds to fall into his succession and be distributed to the plaintiffs as his three heirs. Additionally, the plaintiffs were given incorrect information that it would be better for them from a probate standpoint to see to it that the funds remaining from their mother's succession, which was municipal bond fund holdings, should be depleted first when this actually simply diminished the

funds ultimately available to them upon their father's death. (The residue of their mother's estate was held by the plaintiffs in naked ownership with their father having usufruct of the funds, and therefore ownership would have reverted to them in full upon his death.) As with the situation concerning the beneficiary selection, had the true state of affairs been stated to the plaintiffs concerning the funds which were remaining from their mother's succession, which would come to them in full ownership upon their father's death, versus depleting them and leaving annuity funds that would go as a death benefit to their ex-stepmother, plaintiffs would have either not depleted those funds, or again would have known that steps needed to be taken to correct the beneficiary designation.  (Complaint at ¶¶ 17, 20, 25, and 44, R. Doc. 1.)

The assumed duty to provide accurate information can extend not just to individuals beyond privity in a normal situation, but can specifically extend to prospective heirs, legatees, or beneficiaries. The Louisiana Second Circuit considered this specific situation in its opinion In re Succession of McKnight, 768 So.2d 794 (La. App. 2nd Cir. 2000), in which a bank assumed the duty of advising as to how a bank account should be set up so that funds would be directly distributed to the plaintiff upon the death of the joint account holder. When the bank gave incorrect information, which resulted in the funds at issue going to the decedent's estate, not directly to the plaintiff as intended, the Second Circuit affirmed a trial judgment that the plaintiff had successfully stated and proved a direct claim  for negligent misrepresentation against the bank. Id. at 799.

Louisiana courts have also generally found the duty of care owed in negligent misrepresentation cases pursuant to la. C.C. arts. 2315 and 2316 to be "compatible with the duty stated in the Restatement 92d) of Torts, §552." Lifecare Hospitals, Inc. v. B & W Quality Growers, Inc., 887 So.2d 624, 632 (La. App. 2nd Cir. 2004). With this in mind, the plaintiffs

commend for the Court's consideration the detailed examination of the provisions of Section 552, the national prevailing law of negligent misrepresentation, and the specific application to prospective insurance beneficiaries contained in the Iowa Supreme Court's opinion in Pitts v. Farm Bureau Life Ins. Co., 818 N.W.2d 91 (Iowa 2012).[2]

In Pitts the decedent, the husband of the plaintiff, procured a life insurance policy. To ensure that certain child support obligation was met, the late Mr. Pitts made his daughter the primary beneficiary of the first $35,000.00, with his wife Michele to receive the remainder if she survived him. Id. at 95. According to Michele, when her husband's support obligation ended he requested that the agent undertake the necessary actions to change the policy beneficiary designation so that Michele would be the sole beneficiary for the entire policy benefit. The agent, a Mr. Shiffer informed them that the necessary changes had been made, but as was learned upon Mr. Pitts's death, the change was never made. Id. at 96. With the facts in hand the Iowa Supreme Court made a brief but thorough review of the tort of negligent misrepresentation, including the application of Section 552, the scope and applicability of the tort to those who provide information, and a survey of cases from other jurisdictions looking to Section 552 and allowing negligent misrepresentation claims against insurance agents by those not in privity. Id. at 113. Ultimately, the Iowa Supreme Court held that Michele, although not in privity, could state a claim for negligent misrepresentation, specifically taking note of the fact that once Michele was given false information that the beneficiary change had been made, "she had no reason to ask her husband to take further action to change the policy or to obtain additional insurance on her husband's life from another source if Tom refused to take the necessary steps to effectively change the beneficiary designation." Id. at 114.

---

2    A copy of this opinion is attached hereto as an exhibit for the Court's easy reference.

As is all too common, the final effort to obtain a dismissal on the negligent misrepresentation claim is an attempt to shift all blame to the undersigned based on facts that have not been pled, much less proved, by any party. Specifically, the defendants urge that: Moreover, it is disingenuous for Plaintiff Luke Hyatt to shift his own duty as POA for his father onto INVEST and Mr. Rovig. As POA, Luke Hyatt had access to Mr. Hyatt's personal financial records, including the quarterly Annuity statements, which clearly stated that Ms. McWilliams was the sole beneficiary of the Annuity. Luke Hyatt had only to glance at the quarterly statements, four of which were sent to Mr. Hyatt in Mandeville, where his sons were caring for him, during the time that Luke Hyatt was serving as POA.

(R. Doc. 11-1 at p. 6.)

The status of any quarterly statements appears nowhere in the Complaint, and has not yet been pled. But so that the Court does not operate under any mis-impression, the undersigned will clarify. As was alleged, the undersigned contacted Mr. Rovig in March of 2012, when Donald A. Hyatt's health had worsened, and provided Mr. Rovig with the POA. (Complaint at ¶15 and Ex. A, R. Doc. 1 at p. 4 and R. Doc. 1-1.) During the conversation described in email, which occurred at the end of the very same month in which Donald A. Hyatt supposedly told Mr. Rovig to quit bothering him about the change of beneficiary designation, Mr. Rovig told the undersigned of the structure of the annuity and the residue of Sally Hyatt's estate. The undersigned specifically asked if there were any other recent or pending issues or concerns, and Mr. Rovig denied that there were. In sum, Mr. Rovig made no mention of the purportedly recent efforts to get Donald A. Hyatt to complete beneficiary designation forms.

Moreover, as alleged in the Complaint in Paragraph 14, Donald A. Hyatt instructed the undersigned to use the POA sparingly, so the undersigned did not request wholesale duplication

of statements from Rovig and IFC or from Prudential. Donald A. Hyatt continued to receive and open his own mail until his admission to hospice for his brief period of final terminal illness. The undersigned was never given the opportunity to review the Prudential statements prior to the hospice admission, and during the period of hospice did not have time to locate them and review them. Rather, having been instructed by Donald A. Hyatt, apparently incorrectly, that Mr. Rovig could be relied upon, the undersigned called Mr. Rovig to cut through any problems in locating and obtaining accurate information. Thus, the phone call on a Saturday morning while Donald A. Hyatt was lying in hospice. Mr. Rovig answered the question without hesitation, stating that the plaintiffs were the named beneficiaries for the death benefit, although he promised to review the relevant papers and contact the undersigned if there was any need for further action. No such call was received. (Complaint at ¶¶ 19-20, R. Doc. 1 at pp. 6-7.) Given Mr. Rovig's unequivocal answer and the need to attend to his dying father, the undersigned did not conduct a far reaching search for documents, but rather relied on the investment "professional" who had made the arrangements for the annuity.

Ultimately, the facts in the present matter fit very closely with the facts in both the McKnight case and the Pitts case. Mr. Rovig could easily have declined to answer the question at all, he could have instructed the undersigned to find a Prudential statement, Mr. Rovig could have made inquiries of Prudential and reported back his findings, or he could have done any combination of these three options. Instead, he provided false information without any hint of hesitation and took no further action to correct it.

## IV.    A Negligence Claim Has Also Been Stated

In their argument the defendants lump together the negligence and negligent misrepresentation claims. In the present matter the two claims are very similar, but are not

identical. It has been alleged with clarity that Mr. Rovig not only assumed the duty to give information, but to double check that information and provide corrected information as appropriate. (Complaint at ¶ 37, R. Doc. 1 at 14.) There is no doubt that it has been alleged that he breached this duty by providing false information and never correcting it. (Complaint at ¶¶ 20 and 38, R. Doc. 1 at pp. 6-7 and 14-15.) That the scope of duty, based on public policy, for a general negligence claim includes a requirement that a financial adviser provide accurate information is properly pled. (Complaint at ¶39, R. Doc. 1 at p. 15.) Moreover, such a scope of duty determination is in line with the reasoning set forth by the negligent misrepresentation cases, particularly McKnight. As a result of the negligent actions by Mr. Rovig, not only in making a negligent misrepresentation, but then negligently failing to learn the correct state of affairs and correct his error, the plaintiffs were actually damaged by loss of the residue of their mother's estate and by being deprived of the death benefit from their father's annuity. (Complaint at ¶¶ 38-40, R. Doc. 1 at 14-15.)

Although historically concerned with a negligent failure to correct statements about a plaintiff to a third party which results in harm, Louisiana has recognized a claim for negligent failure to correct prior incorrect statements. See Jones v. Simonson, 292 So.2d 251, 254 (La. App. 4th Cir. 1974); Firstley v. Bill Watson Ford, Inc., 268 So.2d 314, 317 (La. App. 4th cir. 1972); Hardey v. Newpark Resources, Inc., 2008 WL 732715 at *1-3 (E.D.La. 3/18/2008) (Livaudais, J.) ("None of these cases repudiates the Firstley court's determination that a negligence cause of action exists under Louisiana law when a defendant's negligent failure to act to correct information, that, when left uncorrected, causes a plaintiff damages." Id.)

Considering the foregoing, it is respectfully submitted that the Motion to Dismiss should be denied insofar as it is directed at the general negligence claim.

**V.      Contrary to the Misstatement or Misrepresentation of Louisiana Law By Defendants, a LUTPA Claim Has Been Stated**

Defendants have urged that the LUTPA claim should be dismissed for three reasons, summarized as follows:

1.      The events at issue purportedly were not "trade or commerce" as defined in LUTPA;

2.      Purportedly the plaintiffs do not have standing to bring their claims because they are not business competitors or consumers; and

3.      Defendants claim that plaintiffs lack standing as they have purportedly failed to allege any damages actionable under LUTPA.

The utterly meretricious nature of the arguments presented can best be understood by examining the second argument first. Defendants urged that "In order to have standing Plaintiffs must be either consumers or business competitors." (R. Doc. 11-1 at p. 7.) This statement of law is based on a citation to <u>City of Alexandria v. Cleco Corp.</u>, 1:05-01121, 2010 WL 290506, at *11 (W.D.La. Jan. 22, 2010) and <u>Tessier v. Moffatt</u>, 93 F.Supp. 2d 729, 734 (E.D. La. 1998). Unfortunately, the entire argument is based on vacated law.

The Louisiana Supreme Court, in <u>Cheramie v. Shell Deepwater Production, Inc.</u>, 35 So.3d 1053 (La. 2010), framed the issue as follows:

> Noting that plaintiffs are neither business competitors of Shell, nor consumers, facts that plaintiffs concede, Shell has urged a lack of standing. The issue is one of first impression with this court. Although we have denied writs as early a 1982 in cases that have rendered contradictory holdings, we have never addressed the conflict.
> <u>Id.</u> at 1055-1056 (internal footnotes omitted).

The Louisiana Supreme Court then resolved the issue with the following holding:

> An examination of these sections of the LUTPA reveals that the legislation contains no language that would clearly and expressly bar a "person" (such as the individual and the corporation that are the plaintiffs herein) from bringing an action for unfair trade practices. To the contrary, LUTPA grants a right of action

to any person, natural or juridical, who suffers an ascertainable loss as a result of another persons' use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members. As noted in *Capitol House Preservation Company, L.L.C. v. Perryman Consultants, Inc.,* 98-1514, pp. 12-13 (La. App. 1 Cir. 12/10/98), 725 So.2d 523, 530, Louisiana courts have repeatedly held that there is no such limitation in LUTPA.

An evaluation of the words of this statute leads to the conclusion that, consistent with the definition and usage of the word "person," there is no such limitation on those who may assert a LUTPA cause of action any such limitation that has found its way into the jurisprudence resulted without proper analysis of the statute.
Cheramie, 35 So.3d at 1057 (internal footnote omitted).

This Honorable Court recognized and applied this shift in the case law concerning LUTPA last year, holding:

Defendant asserts that this private right of action is limited to direct consumers or business competitors, and that Inflatable Zoo fails to allege that it is a business competitor of About to Bounce. The Court acknowledges that the Fifth Circuit previously limited LUTPA's private right of action to consumers and business competitors, however, the Louisiana Supreme Court has since held that LUTPA includes no such limitation. The Court finds that the complaint as a whole contains sufficient factual allegations to establish Inflatable Zoo's standing to sue under LUTPA.
Inflatable Zoo, Inc. v. About to Bounce, L.L.C., 2013 WL 1558264, *4 (E.D.La. 4/11/13)(Feldman, J.)(internal citations and footnote omitted).

Thus, defendants have either misstated a fundamental change in the law that is only slightly less than four years old, or have misrepresented the current status of the law to the Court. The net result is the same, however, to wit that there is no requirement that plaintiffs be business competitors or consumers with regard to the services of defendants Rovig and IFC in order to have standing.

Interestingly, even if the current rule of law required that plaintiffs be business competitors or consumers, the plaintiffs meet the definition. Mr. Rovig, in his capacity as an IFC agent offered advice to the plaintiffs concerning the order of asset liquidation, resulting in the

liquidation of funds from their late mother's estate first so as to simplify probate because her estate would not have to be considered upon the demise of Donald A. Hyatt. This was investment advice given by Mr. Rovig for the direct benefit of the plaintiffs, not Donald A. Hyatt, because as is customary and usual in this world, he is not around to contend with the complexities or simplicity of completing his own succession. (See Complaint at ¶17, R. Doc. 1 at p. 5.)

Turning to the defendant's remaining two arguments, neither has merit.

The defendants urge that Mr. Rovig giving advice and information to the plaintiffs was not "trade" or "commerce" within the meaning of LUTPA. LUTPA provides a statutory definition of "trade" or "commerce" as meaning the "advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of this state." La. R.S. 51:1401(9). Mr. Rovig provided services, in the form of advice and information on financial matters directly to the plaintiffs, both as to the handling of their late mother's estate residue and concerning their beneficiary status with regard to their father's annuity. He went further in his emails, and even offered further assistance in handling any investments for the plaintiffs. (Complaint at ¶23, R. Doc. 1 at 7.) The defendants attempt to artificially limit the meaning of "trade" or "commerce" to only the original sale of the annuity product. This neglects the fact that Mr. Rovig, as is alleged throughout the Complaint and supported by the numerous exhibits thereto, engaged in various financial transactions, which culminated in the rendition of the misrepresentations and unethically bad advice to the plaintiffs.

The defendants also assert that the plaintiffs have not allege sufficient damages to state a claim pursuant to LUTPA. Plaintiffs alleged actual damages, the loss of their rights to the residue

of their mother's estate to which plaintiffs had naked ownership and emotional distress. Humiliation and emotional distress allegations alone, without more, are sufficient to state a LUTPA claim. <u>Laurents v. Louisiana Mobile Homes, Inc.</u>, 689 So.2d 536, 542-543 (La. App. 3rd Cir. 1997). The plaintiff's deprivation of an actual interest in the financial residue of their mother's estate, which was slightly less than $28,000.00 at the time it was liquidated, due to information given with an unethical conflict of interest is an actual damage given that had the residue been left intact it would have gone to the plaintiffs upon their father's death. Instead, Mr. Rovig gave unethical advice based upon the false statements that all was in order and that if their mother's estate was depleted first the probate situation would be simplified for the plaintiffs because the funds would simply come to them as a death benefit, which is treated as a life insurance payment. All of this must be viewed against the conflict of interest inherent in the fact that Dr. McWilliams was already another customer of Mr. Rovig, and Mr. Rovig had reason to believe that he would be more likely to obtain additional business from her as an existing customer. (Complaint at ¶¶ 49-52, R. Doc. 17-19.)

## V. The Claims at Issue Are Not Subject to the Arbitration Agreement Signed by Donald A. Hyatt, Plaintiffs' Late Father

The defendants wish this matter arbitrated, and they urge the Court to apply the doctrine of third party beneficiary status to compel arbitration by the plaintiffs of their various claims against defendants IFC and Rovig.

Before turning to the exact applicable rule of law concerning third party beneficiary status and forced arbitration, it is important to clarify and separate two points of law. First, as a matter of general law and legal history, plaintiffs do not dispute the notion that the Federal Arbitration Act was intended to change the landscape and reverse historical judicial animosity towards arbitration. (R. Doc. 11-1 at p. 9.) Second, the defendants incorrectly attempt to argue

that there is some presumption that the issues herein are subject to arbitration. (See R. Doc. 11-1 at p. 9 generally, fn 12 specifically, and fn 13.) The rules of law cited by defendants would be correctly applicable if the plaintiffs and defendants had signed the arbitration agreement and the issue at hand were merely whether particular issues in dispute between them fell within the scope of the arbitration agreement. Judge Drell of the Western District explained in Bilyeu v. Johanson Berenson LLP, 809 F.Supp.2d 547, 551 (W.D.La. 2011), "Any preference for arbitration is reserved for the interpretation of a valid arbitration clause, not he question of whether an arbitration agreement exists between these parties . . . "[3] Indeed, the applicable presumption is that "[p]arties are presumed to be contracting for themselves only." Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347, 361 (5th Cir. 2003).[4]

Brief or background references to a contractual relationship are insufficient to constitute reliance on the contract sufficient to trigger the application of direct beneficiary estoppel. See Norcast, S.A.R.L. v. Castle Harlan, Inc., 2014 WL 43492, *6 (S.D.N.Y. 1/6/2014). Indeed, the direct beneficiary doctrine is correctly applied only in cases in which the plaintiff's "entire case hinges" on the contractual rights. R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 161 (4th Cir. 2004). Put another way, "it is not enough that the contract is factually significant to the plaintiff's claims or has a "but-for relationship with them." Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 449 Fed. Appx. 704709 (10th Cir. 2011), accord, Bailey v. ERG Enterprises, LP, 705 F.3d 1311, 1321-1322 (11th Cir. 2013). Thus, even though Mr. Rovig

---

3  In Bilyeau Judge Drell briefly, but thoroughly, surveys the applicable Supreme Court case law.

4  One factor which weighed against compelling arbitration by the non-signatory in the Fifth Circuit's Bridas opinion was the fact that the arbitration agreement applied only to the parties and did not specify whether the terms applied to third party beneficiaries. Bridas, 345 F.3d at 362-363. In the present matter the superseded 1999 agreement provided that, "Arbitration is final and binding on the parties." (Complaint Ex. U, R. Doc. 1-21 at p.2.) The arbitration agreement that the defendants now seek to enforce contains the exact same provision that, "Arbitration is final and binding on the parties." (R. Doc. 12-1.) The only arbitration clause which provides that others claiming any rights through the parties would be bound is the 2012 form, which was never signed by Donald A. Hyatt, the plaintiffs, or any person acting on their behalf. (Complaint Ex. S at ¶20, R. Doc. 1-19 at p. 8.)

would not have been in a position to give advice or information to the plaintiffs, particularly the undersigned, absent the contract between Donald A. Hyatt and IFC is not enough to justify the application of direct beneficiary estoppel.

The foregoing leads to the ultimate issue concerning direct benefits doctrine, whether the present claims by non-signatories must be arbitrated. In Noble Drilling Svcs, Inc. v. Certex USA, Inc., 620 F.3d 469 (5th Cir. 2010), the Fifth Circuit examined the application of estoppel to the issue of compelling a non-signatory to arbitrate. In Noble the plaintiff purchased wire rope from Certex, which Certex in turn ordered from its supplier, Bridon. The distributor agreement and purchase orders between Certex and Bridon contained arbitration clauses. Id. at 471. When the wire ropes failed, and Noble's rigs were damaged, it sued both Certex, the distributor, and Bridon, the manufacturer. Noble sued asserting claims for breach of contractual warranty, breach of implied warranty of merchantability, negligence, fraud and fraudulent inducement, redhibition, and violation of the Louisiana Products Liability Act. Id. at 472. Both defendants, Certex and Bridon, moved to force the matter to arbitration based on the arbitration clauses contained in the distributorship agreement and purchase orders, all agreements between Certex and Bridon. Id. The district court dismissed in favor of arbitration, relying upon direct benefits estoppel, and the Fifth Circuit reversed. Id. at 472-475. Two theories were examined by the Fifth Circuit.

First, the Fifth Circuit held that the theory of estoppel requiring an non-signatory to arbitrate when the non-signatory knowingly exploits the contract requires **actual** knowledge of the terms of the contract. Id. at 473. In the present matter the plaintiffs did not have actual knowledge of the terms of any purported contract during the operative events. Moreover, even when the undersigned requested a copy of the relevant arbitration agreements, the documents as

provided did not contain the arbitration agreement defendants seek to enforce.[5] (Complaint at ¶57, R. Doc. 1 at p. 20.) Indeed, the defendants failed to attach the relevant arbitration clause document to their motion, and it was only introduced into the record recently with a Motion for Leave. (R. Doc. 12, 12-1, and 12-2.) Thus, the plaintiffs had no actual knowledge of the purportedly relevant arbitration agreement until after the present litigation had begun, which the Fifth Circuit held is insufficient to support one theory or method for the application of direct benefits estoppel. Id.

The second method for the application of estoppel is the direct beneficiary doctrine, which is based on assertion of a claim that can "only be determined by reference to an agreement containing an arbitration clause." Id. at 474. In Noble the Fifth Circuit reversed the trial court's dismissal and remanded for proceedings on the merits because all of Noble's claims were based on "pre-purchase representations", i.e. statements beyond the contracts containing the arbitration clause, and/or "obligations imposed by law." Id. at 474-475. In the present matter the claims asserted are specifically limited to those duties imposed by law without reference to the specific terms of the contract between Donald A. Hyatt and IFC. (Complaint at ¶62, R. Doc. 1 at p. 21.) Additionally, the claims are limited to tort claims asserted by the plaintiffs individually as "prospective beneficiaries of the Prudential annuity contract and/or direct recipients of advice from Mr. Rovig." (Complaint at ¶63, R. Doc. 1 at p. 21.) When Mr. Rovig gave advice as to which funds should be depleted first to make probate easier for the plaintiffs, and even more obviously when he began to offer advice and/or investment services to the plaintiffs directly, that

---

5 The omission of the exact arbitration clause at issue would seemed odd when transmitted by Mr. Forbush's secretary, Ms. Denslow, but the undersigned has maintained a copy of the pdf's as downloaded in the early hours of November 1, 2013 as email attachments to her email of October 30, 2013. The critical pdf file, named "HyattNAFsigned1.14.2002.pdf" is missing the page 3 containing the arbitration clause recently submitted by the defendants. To double check this, the undersigned returned to the October 30, 2013 email in his email account and re-downloaded the attachments, and observed again that the attachments, as freshly downloaded, are missing the relevant page.

advice was outside the scope of the contract between Donald A. Hyatt and IFC, and was analogous to the pre-purchase representations" in Noble.[6]

This Honorable Court carefully considered and applied federal law as it relates to compelling a non-signatory to arbitrate a claim in Mosaic Underwriting Service, Inc. v. Moncla Marine Operations, L.L.C., 2013 WL 1556141 (E.D.La. 4/11/13) (Feldman, J.). Six potential theories for compelling arbitration were identified and examined, including (1) Incorporation by Reference, (2) Assumption, (3) Agency, (4) Veil-piercing/Alter ego, (5) Estoppel, and (6) Third-party Beneficiary. Id. at *3-5. The first, incorporation by reference, is obviously inapplicable as there is no later agreement between the plaintiffs and defendants. Id. at *3. Similarly, assumption is inapplicable as the plaintiffs have contested the applicability of arbitration to their individual tort claims at every turn. Id. at **3-4. Agency is inapplicable as there is no evidence of any intent by the plaintiffs to authorize Donald A. Hyatt to bind them to arbitration. Id. at *4. Veil-piercing/Alter ego is facially inapplicable as the plaintiffs are natural persons, not corporate entities. Id. at *4. Estoppel, as it relates to this matter, includes when the nonsignatory the knowing exploits the contract containing the arbitration clause. Id. at *5. As noted above, the plaintiffs in the present matter did not possess the arbitration clause defendants seek to enforce until it was filed with a Motion for Leave on January 30, 2014, well after the present litigation was commenced. As the Fifth Circuit held in Noble an absence of actual knowledge is sufficient to prevent compelled arbitration under an estoppel theory.

Finally, the theory the defendants assert must be considered, the third party beneficiary doctrine. In Mosaic the claims at issue were Louisiana state law tort claims, including negligence, fraud, LUTPA violations, breach of fiduciary duty, and detrimental reliance, all

6    The analogy is actually quite good as Mr. Rovig's later advice and offer of investment services was clearly intended to obtain investment business from the plaintiffs reinvesting the death benefit payable upon the death of Donald A. Hyatt.

asserted as extra-contractual claims around a contract of excess insurance coverage. Mosaic, 2013 WL 1556141 at *2. The excess carrier moved to have these claims forced into a previously ordered arbitration between Moncla and its primary insurers. This Honorable Court declined to order the tort claims by Moncla to arbitration, holding:

> "[T]\he fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary." Excess P & I Underwriters have an obvious interest in the enforcement of the Hull and Primary P & I policies, because the enforcement of those policies will determine whether or not Excess P & I's policy is implicated. But the Fifth Circuit has instructed that this fact alone does not make Excess P & I Underwriters a third-party beneficiary. Further, "[p]arties are presumed to be contracting for themselves only . . . . This presumption may be overcome only if the intent to make someone a third-party beneficiary is clearly written or evidenced in the contract.:" The Court cannot find, based on this record, that the Hull and Primary P & I policies show the requisite clear intent to benefit the Excess P & I Underwriters. In addition, the Fifth Circuit has expressed reluctance in binding a nonsignatory on the third-party beneficiary theory when the nonsignatory never filed a claim against the signatory premised upon the agreement, or otherwise sought to enforce its terms. Therefore, the Court finds Express P & I Underwriters are not bound under this theory.
> Mosaic, 2013 WL 1556141 at *5 (internal citations omitted).[7]

This Court's decision in Mosaic was no aberration in Fifth Circuit law. Only a few months previously Judge Hittner of the Southern District of Texas considered another oilfield user, seller, manufacturer case similar in structure to the facts in Mosaic. Petrobas America, Inc., 921 F.Supp.2d 685 (S.D. Tex. 2013). Although Judge Hittner relied on Noble instead of reaching further back in Fifth Circuit law, the reasoning and result were substantially identical, holding that a lack of knowledge of the actual terms of the contract,  a specific disclaimer of any reliance on the contract terms, and reliance, and a reliance on general tort duties and pre-purchase

---

7   Plaintiffs are mindful that the Court stayed the claims of the Excess Underwriters in Mosaic pending the outcome of the London arbitration between Moncla and the primary insurers. Mosaic, 2013 WL 1556141 at **6-7. In the present matter there is no parallel arbitration to justify a stay of the matter pending before this Honorable Court. While initially it was planned that the potential claims held by the Succession of Donald A. Hyatt would be submitted to arbitration, as recited in Paragraph 63 of the Complaint (R. Doc. 1 at p. 21.), at this time no such arbitration has been filed and there is no present plan to further pursue those claims.

statements was sufficient to deny the motion to compel arbitration. <u>Petrobas</u>, 921 F.Supp.2d at 696.

Defendants make much of the notion that through "creative" or "artful" pleading the plaintiffs are seeking to avoid arbitration. (R. Doc. 11-1.) It is axiomatic that plaintiffs are the masters of their claims and are free to shape their claims, via the drafting of their pleadings, as they see fit. With that in mind, it is obvious that the plaintiffs do not desire that their claims be arbitrated, and that certain trade offs, including the bypassing of certain claims that might have been asserted, has occurred. Such drafting, including the selection of claims and venues, is routine and there is nothing improper about such careful pleading so long as there is no improper pleading, such as fraudulent joinder, false pleading of jurisdictional facts, or similar impropriety. Put another way, the defendants have no particular right to choose where they are sued so long as the appropriate rules of jurisdiction and venue are followed.

Turning more directly to the issue of whether the plaintiffs in this matter should be compelled to arbitrate, a careful application of the authorities in this matter to the facts as plead reveals that the third party beneficiary doctrine is inapplicable and, it is therefore respectfully urged that the motion to compel arbitration should be denied. The particular facts which are critical to this outcome are as follows:

1.     As has been agreed by all the parties to date, none of the three plaintiffs signed the arbitration clause or any contract containing the arbitration clause at issue.

2.     Unlike the unsigned 2012 arbitration agreement, the arbitration agreement the defendants seek to enforce does not specify that it is intended to be binding on third party beneficiaries, but only refers to the parties to the contract being bound to arbitrate.

3.     The claims asserted have been clearly limited to claims asserted under prevailing Louisiana tort law, specifically general negligence, negligent misrepresentation, and unfair trade practices. These claims are not claims for breach of the contract between Donald A. Hyatt and IFC. These tort claims are directly analogous to the tort claims asserted in <u>Noble</u>, 620 F.3d at 472 and in <u>Mosaic</u>, 2013 WL 1556141 at *1.

4.     Mr. Rovig gave direct advice, information, and/or offers of service to the plaintiffs through communications to the undersigned that went beyond the scope of IFC's contract with Donald A. Hyatt and Mr. Rovig's role as IFC's agent servicing that contract. In particular, he gave advice intended to make probate easier by depleting the remaining asset belonging to the plaintiffs' late mother's estate (Complaint at ¶17, R. Doc. 1 at 5.), having misrepresented to the plaintiffs that they were the beneficiaries of the death benefit he offered to advise the plaintiffs on how to invest their respective shares of the death benefit (Complaint at ¶25, R. Doc. 1 at 7.), and then acted well beyond the scope of the contract with Donald A. Hyatt in his attempts to correct the beneficiary designation and/or convince Dr. McWilliams to disclaim the death benefit (Complaint at ¶25, R. Doc. 1 at p.8.). Perhaps the most revealing statement as to Mr. Rovig going beyond the terms of any contract between Donald A. Hyatt and IFC in his attempts to correct his misrepresentation of the beneficiary status is his email of May 6, 2013 to the undersigned. Having previously told the undersigned that he could not, at least not acting within the rules of his licensing authorities, place any pressure on Dr. McWilliams to disclaim the death benefit, Mr. Rovig asked the undersigned how to skirt that rule. He wrote, in substance:

> Luke,
> How to pressure, without pressure???
> Nuf said.
> Joe Rovig.
> (Complaint Ex. M, 5/6/2013 email, R. Doc. 1-13 at p. 5.)

These communications are analogous to the pre-purchase communications in Noble.

5.      The plaintiffs did not have actual knowledge of the purportedly controlling arbitration agreement until it was provided to them recently as an attachment to Motion for Leave. (Complaint at ¶¶ 56-58, R. Doc. 1 at 20 and R. Doc. 12-1.)

6.      The only role that the contract between Donald A. Hyatt and IFC plays is a background role, or precisely the "but for" role which has been held to be insufficient. Granted, the plaintiffs came into contact with Mr. Rovig because of the IFC contract, but the duties and roles assumed by Mr. Rovig, as well as the torts sued upon, go beyond or outside the terms of that contract.

Ultimately, the claims asserted in this matter are similar both in nature and posture to the claims asserted in Noble and Mosaic. As this Court observed in Mosaic, by quoting the Fifth Circuit from Bridas, "Arbitration agreements apply to nonsignatories only in rare circumstances." Mosaic, 2013 WK 1556141 at *2, quoting, Bridas, 345 F.3d at 358. Given the precise relationship of the parties, the tort claims asserted, the decision to not pursue contract claims or any claims based on the precise terms of the contract, and the actions by Mr. Rovig that assumed duties to the plaintiffs beyond the contract, this case is not one of those rare circumstances. Therefore, it is respectfully submitted that the motion to compel arbitration should be denied.

## **CONCLUSION**

Considering the foregoing, it is respectfully submitted that the motion to dismiss should be denied. Mr. Rovig clearly failed in a negligent way, to make accurate statements or to timely correct his misrepresentations. Similarly, he gave false information and bad recommendations, such as the liquidation of the residue of Sally Hyatt's estate, when it resulted in more money ending up in the hands of Donald A. Hyatt's ex-wife, not the plaintiffs, despite Donald A. Hyatt repeatedly stating that she was to receive nothing. Of course, she is another customer of Mr.

Rovig.  It is respectfully submitted that this advice, unethical due to the conflict of interest and resulting outcome, supports a denial of the motion to dismiss the LUTPA claim.

With regard to the plea for an order compelling arbitration, a careful analysis of the contracts at issue, the claims asserted, the claims not asserted, and the standing of the parties reveals that the plaintiffs, as non-signatories to any arbitration agreement should not be forced into arbitration based upon a contract they never signed. This is a narrowly asserted state law tort claim, which does not rely upon the contract containing the arbitration clause. Applying the case law of both this Court and the Fifth Circuit, such a claim is not subject to the arbitration clause contained in the investment contract.

Respectfully Submitted,


_____*s/Donald L. Hyatt, II*_____
**DONALD L. HYATT, II (24808) T.A.**
DONALD L. HYATT, II APLC
Energy Centre, Suite 2960
1100 Poydras St.
New Orleans, LA 70163
Telephone: (504) 582-2466
Facsimile: (504) 582-2422
E-Mail: hyattlaw@aol.com
***IN PROPER PERSON AND AS COUNSEL***
***FOR PLAINTIFFS MARSHALL A. HYATT***
***AND  JOHN D. HYATT, M.D.***

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. I further certify that I mailed the foregoing document by first class mail to all non-CM/ECF participants.

_____s/Donald L. Hyatt, II_____