UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DONALD L. HYATT, II, ET AL.                          CIVIL ACTION

v.                                                   NO. 13-6328

LAVERN D. ROVIG, ET AL.                              SECTION "F"

ORDER AND REASONS

Before the Court is the defendants' Rule 12(b)(6) motion to dismiss, or alternatively, to stay and compel arbitration.  For the reasons that follow, the motion to dismiss is GRANTED in part and DENIED in part, and the defendants' request to stay and compel arbitration is DENIED.

Background

This lawsuit concerns a dispute between the alleged intended beneficiaries of an annuity death benefit and an investment advisor: three sons allege that they relied on their late father's investment advisor's representation that they were named as equal beneficiaries of the death benefit when, in fact, their father had neglected to change the designation from his ex-wife to his sons. As a result of the investment advisor's misrepresentation and alleged negligence in failing to confirm that their father's intentions were memorialized in his beneficiary designation, their step-mother, who had bitterly divorced their father after he was diagnosed with cancer, refused to disclaim the funds and consequently received the benefit.

1

Donald A. Hyatt purchased an annuity product described as Prudential Advantaged Series Xtra Contract #74430A227 through his investment adviser, Mr. Lavern D. Rovig, who was acting in his capacity as an agent for IFC Holdings, Inc., d/b/a Invest Financial Corporation. Mr. Hyatt designated his then-wife, Dr. Mary E. McWilliams, as the beneficiary of the Annuity's death benefit. Mr. Hyatt's previous wife, Sally W. Hyatt, had died in 1993; together, they had three sons: Donald L. Hyatt, II, Marshall A. Hyatt, and John D. Hyatt, M.D.

Mr. Hyatt and Dr. McWilliams lived in Shreveport, Louisiana. In early 2011 Donald Hyatt was diagnosed with liver cancer. After receiving cancer treatment, Mr. Hyatt underwent in-patient treatment for alcohol abuse at a facility in Shreveport. Mr. Hyatt's then-wife and his sons disagreed as to where Mr. Hyatt should live after he was released from treatment. Ultimately, the dispute was resolved: Donald Hyatt was discharged to the care of his sons, Donald Hyatt, II and Marshal Hyatt. When Donald Hyatt was released from the hospital on October 31, 2011, he lived in Mandeville with Donald Hyatt, II (who is called Luke).

Shortly after moving to Mandeville, Donald Hyatt executed a durable power of attorney, granting the authority to manage his affairs as needed; his father instructed Luke to use the power of attorney sparingly. By March 28, 2012, at his father's request, Luke contacted Mr. Rovig, to provide him with the power of

2

attorney, and to open up a line of communication regarding financial matters. From August to November 2012, Luke Hyatt, pursuant to the durable power of attorney granted by his father, made withdrawals from the Prudential annuity for his father's benefit. At some point in the fall 2012, Mr. Hyatt and Dr. McWilliams divorced.

On November 15, 2012 Mr. Rovig advised Luke Hyatt that other funds were available to help manage his father's expenses, funds from an account other than the Prudential annuity: an account containing funds that were a residue from the succession of Sally Hyatt, the Hyatt sons' mother, who died in 1993. Using funds from the succession account to fund his father's expenses, Mr. Rovig advised, would simplify succession or probate problems when his father died. Luke Hyatt agreed, and the funds from the succession account were used for Hyatt's care.

Mr. Hyatt's health declined. On January 16, 2013 he checked into Canon Hospice in Metairie, Louisiana. By email, Luke Hyatt notified Mr. Rovig, who had become friends with his father over the years; Luke asked for advice regarding getting cash necessary for the his father's care and easing estate processing. Mr. Rovig advised that the annuity was the only remaining investment and that "[t]he monthly distributions are very flexible and we can increase or decrease based on your call."

Mr. Hyatt's condition continued to deteriorate. He gave Luke

more control over his financial affairs.  Mr. Hyatt made it clear to his sons that he desired all of his funds and any death benefits to go to them and not to his ex-wife, Dr. McWilliams.  On January 26, 2013, a Saturday, Luke tried to reach Mr. Rovig, who returned his call.  During the telephone conversation, Luke related his father's concern that Dr. McWilliams not receive any money upon his death.  Mr. Rovig told Luke that he was aware that at the time his father made his annuity investment he and Dr. McWilliams had a separate property regime due to a prenuptial agreement, and that Mr. Hyatt had listed his three sons as equal beneficiaries for the death benefit; Mr. Rovig also told Luke Hyatt during the phone call that he would check that information during the next week and would let him know if any action needed to be taken or if there was cause for concern.  Mr. Rovig never contacted Luke to follow up regarding the beneficiary issue.

Mr. Hyatt died March 16, 2013 .  Two days later, by email, Luke notified Mr. Rovig that his father had died; he wrote:

> ...
> [I]t falls to me to take the lead on the pending business issues.  The funeral director has informed me that I should have the certified copies of the death certificate in approximately 14 days.  Kindly provide me with whatever forms or other application must be made to obtain the death benefit from the Prudential annuity for my brothers and myself.
> Thank you again for your assistance and friendship with my father.

The next day, Mr. Rovig replied:

> ...

I will start the process of claim today and will be
forwarding the paper as it is available.
For now, you boys will have to decide how you wish to
take the benefit.  You may have cash, transfer your
respective shares to a similar product variable annuity
, or another investment "type" vehicle.  We will be
available to discuss any of the options that may be
considered.
I will need one original (raised seal type) death
certificate for the claim.
Please keep me posted as to the final service in
Marshall.  Peg and I would be honored to attend.

On April 4, 2013, Luke wrote Mr. Rovig concerning funeral

arrangements, and requested that he transmit any forms to complete

the claims process for the death benefit.  Later that day, Mr.

Rovig replied:

Luke,
Peg and I are planning to be there for the service....
If possible, I would like to visit with you and your
brother[s] either that evening, or after the services on
Saturday.

We will have a problem with the inheritance.  The annuity
company (Prudential) advises that Mary McWilliams is the
sole beneficiary on the contract.  When she and your Dad
divorced, this was not supposed to be an issue and Dad
was to have notified the Annuity company of his desires
regarding the beneficiary(s).  I have questioned the
Annuity Company about this and they have advised they
never received ANY contact, verbally or in writing
regarding any beneficiary changes.  Regretfully, we are
now stuck with this legality regarding named
beneficiary's.

I was finally able to contact Dr. McWilliams and she
professed NO knowledge of the contract and acted
surprised to know that there was any monies left.  I do
not know of your relationship with Dr. McWilliams,
but????  As you may be aware, named beneficary's do have
a right to disclaim their rights, however, I do not know
if Dr. McWilliams would entertain that possibility.  From
the few discussions that your Dad and I had up to his
moving to the New Orleans area, I do not think she would

disclaim anything.   However, I can ask.   Were she to disclaim, then the beneficiary of the contract would be Dad's estate and would have to be handled by the court approved and appointed Executor/Personal Representative in accordance with the provisions of any stated will.   If she does not disclaim, then she is entitled to accept the proceeds of the contract upon presentation of a claim.

Again my sympathy's are with you and your brother's at this time, and will see you on Saturday week or earlier, God willing.

Luke responded in a lengthy email, advising Mr. Rovig of his understanding of the situation and a time-line of their communication:

...

2013-1-26   As my father's condition began to decline I became concerned about confirming whether the annuity needed to be fully drawn down to run the funds through his estate upon his death or whether there was a death benefit, and if so had the proper beneficiary selections been made.   My father had unequivocally made it clear, even to the point of executing a will that explicitly disinherited Dr. McWilliams, that he desired that she receive nothing due to her abandoning him during his cancer illness and divorcing him in about as ugly a fashion as possible.   You replied during the phone call that you were aware at the time he made his annuity investment that they had a separate property regime due to a pre-nuptial agreement and that he had listed myself and my two brothers as the beneficiaries.   Finally you indicated that you would check the information during the coming week and let me know if any action was needed or if there was cause for concern.   I never received any such call....

2013-3-19   You replied to my email of 3/18/2013.   With regard to the annuity benefit you wrote [asking how "you boys" wish to take the benefit].

I can only conclude from this communication that you still believed my brothers and I were the beneficiaries and that the actual paperwork was never checked prior to this email communication to confirm the identity of the

named benificiary(ies).

...

My father made it clear to me that he wanted Dr. McWilliams to receive nothing, and his antipathy towards her even went so far as for him to make a specific instruction that she was to not receive a phone call concerning his death, but was to learn, if at all possible, from the newspaper obituary.  They were not actually divorced until June 22, 2012.  Thus it seems unlikely that were conversations with him about changing the beneficiary status post divorce given that these discussions would have been relevant and mentioned either in November 2012 when you advised that the 28k account from my mother's estate be depleted prior to the depletion of the annuity or when I asked you in January of 2013 as to the beneficiary status.  Specifically, with regard to which should be depleted first and the probate problem avoidance, any uncertainty of recent change in the beneficiary status would have been relevant and fresh in your mind.  Similarly, what I was told on January 26, 2013 was that my brothers and me had been named by him at the contract inception, not as a recent change.  I can only assume that this is an error in memory.

...

All of this gravely concerns me as the net result is that despite specific inquiry as to the beneficiary status in my capacity as my father's attorney in fact, holding a durable power of attorney, I received and relied on inaccurate information concerning the beneficiary election on his Prudential Annuity.  This deprived me of the opportunity to present him with appropriate forms while he was lucid to correct the selection to match his wishes.

I understand that you will attempt to get Dr. McWilliams to disclaim the annuity death benefit proceeds.  I have another claim against her for fraud from when she misrepresented my father's medical condition to me in a recorded phone call in an effort to convince me to assist her in obtaining an interdiction of him so she could commit him.  It turned out that she was misrepresenting the true situation and the hospital denied that they had ever made the diagnosis of alcoholic dementia, which was what she had claimed.  When I exposed her misrepresentation and it became known that I could prove

her fraud, suddenly the hospital decided that my father could not be released to her care and the discharge papers by the hospital were changed. Additionally, she then filed for divorce and tried to prevent him from obtaining any of his personal effects other than the ones she selected and crammed into his car, which she left waiting in the driveway of their former matrimonial domicile. Given this background I doubt she will disclaim anything. On the other hand, such a civil claim against her may result in a global settlement which might include a disclaimer of the annuity benefits.

While I certainly hope you can obtain a disclaimer from her, and I encourage you to attempt to obtain same, I am not necessarily optimistic that such a disclaimer can be obtained without the added leverage of litigation over her fraud.

Should my understanding of the situation be in error...please let me know at your earliest by reply email.

Mr. Rovig was not able to attend Mr. Hyatt's funeral. Luke and Mr. Rovig continued to exchange emails regarding the status of Rovig's attempts to persuade Dr. McWilliams to disclaim the death benefit. Luke told Mr. Rovig that -- if he failed to persuade Dr. McWilliams to disclaim the death benefit -- he and his brothers would assert an errors and omissions claim against Mr. Rovig. Dr. McWilliams refused to disclaim the death benefit. Luke presented by email to the appropriate INVEST contact on June 11, 2013 the errors and omissions claim for Mr. Rovig's allegedly substandard conduct in the discharge of his duties.

By letter on August 12, 2013 a representative of INVEST advised Luke Hyatt that it was closing his inquiry on the ground that Mr. Rovig had relied on conversations he had with him

regarding changing the Annuity's death beneficiary; according to Mr. Rovig, Mr. Hyatt had stated that he was taking care of it.

On November 3, 2013 Mr. Hyatt's sons, Luke, Marshall, and John, sued IFC Holdings, Inc., d/b/a INVEST Financial Corporation, and Lavern D. Rovig, asserting claims for negligence, negligent misrepresentation, and unfair trade practices; they have also sued Jackson National Life Insurance Company, as the alleged insurer for INVEST.  The defendants now seek dismissal of the plaintiffs' claims for failure to state a claim; alternatively, they seek to compel arbitration.

I.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor.  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed.R.Civ.P. 8).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

9

defendant-unlawfully-harmed-me accusation." <u>Id.</u> at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" <u>See</u> <u>Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit</u>, 369 F.3d 464 (5th Cir. 2004) (quoting <u>Jones v. Greninger</u>, 188 F.3d 322, 324 (5th Cir. 1999)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. <u>Kaiser</u>, 677 F.2d at 1050. Indeed, the Court must first identify allegations that are conclusory and, thus, not entitled to the assumption of truth. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678-79 (2009). A corollary: legal conclusions "must be supported by factual allegations." <u>Id.</u> at 678. Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement to relief." <u>Id.</u> at 679.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Gonzalez v. Kay</u>, 577 F.3d 600, 603 (5th Cir. 2009)(quoting <u>Iqbal</u>, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

10

555 (2007) (citations and footnote omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011)(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

551 U.S. 308, 322 (2007)).

## II.

### A.
#### *Negligence and Negligent Misrepresentation*

The defendants contend that the plaintiffs have failed to state a cause of action for negligence and negligent misrepresentation.  The Court disagrees.

"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).  "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."  La. Civ. Code art. 2316. Courts employ the duty-risk analysis to determine whether to impose liability based on these broad negligence principles.  See Lemann v. Essen Lane Daiquiris, 923 So. 2d 627, 633 (La. 2006); see also Barrie v. V.P. Exterminators, 625 So. 2d 1007, 1015 (La. 1993)(holding that "case by case employment of the duty/risk analysis is the appropriate standard in this state for determining legal responsibilities for negligent misrepresentations"); see also See Conerly Corp. v. Regions Bank, No. 08-813, 2008 WL 4975080, at *7 (E.D. La. Nov. 20, 2008)(Vance, J.)("Negligent misrepresentation is a species of negligence in Louisiana, and courts employ roughly the same test for liability used in the standard duty/risk analysis.").

This duty-risk analysis requires a plaintiff seeking to

12

recover for negligence or negligent misrepresentation to prove five

elements:

> (1) the defendant had a duty to conform his conduct to a
> specific standard (the duty element);
> (2) the defendant's conduct failed to conform to the
> appropriate standard (the breach element);
> (3) the defendant's substandard conduct was a cause in
> fact of the plaintiff's injuries (the cause-in-fact
> element);
> (4) the defendant's substandard conduct was a legal cause
> of the plaintiff's injuries (the scope of liability or
> scope of protection element); and
> (5) the actual damages (the damages element).

Lemann, 923 So.2d at 633 (citation omitted).

Here, the parties dispute the threshold duty element.  "In

deciding whether to impose a duty in a particular case" -- an issue

of law -- " Louisiana courts examine 'whether the plaintiff has any

law (statutory, jurisprudential, or arising from general principles

of fault) to support the claim that the defendant owed him a

duty.'"  See Audler v. CBC Innovis Inc., 519 F.3d 239, 249 (5th Cir.

2008)(quoting Faucheaux v. Terrebonne Consol. Gov't, 615 So.2d 289,

292 (La. 1993)).  Invoking general principles governing the duties

owed to an investor by a broker,[1] the defendants contend neither

Mr. Rovig nor INVEST owed any duties to plaintiffs to ensure that

they were named as beneficiaries of their father's Annuity.  The

defendants insist that the only duty owed, if any, was to the late

---

[1]See Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d
523, 530 (5th Cir. 1987)("the nature of the fiduciary duty owed
[by a broker to his client] will vary, depending on the
relationship between the broker and the investor [and] the nature
of the account is a factor to be considered").

Mr. Hyatt; it was Mr. Hyatt that controlled the beneficiary designation, and Luke Hyatt, as power of attorney, should have glanced at a quarterly Annuity statement, which would have clearly stated that Dr. McWilliams was the sole beneficiary of its death benefit. The plaintiffs counter that Mr. Rovig, acting as an agent for INVEST, assumed the duty of providing correct information to the plaintiffs when he provided information concerning who was named as the beneficiary for the death benefit and when he advised that handling estate matters for their father would be facilitated if the funds remaining in their late mother's estate were depleted, to pay for Mr. Hyatt's care, before using funds in the Annuity. Louisiana negligence principles support the plaintiffs' position.

The case literature recognizes that an individual might assume a tort duty to provide accurate information by providing information voluntarily for reliance by a person or entity not in privity with the information provider. See, e.g., Boyte v. First Nat. Bank of Crossett, 288 Fed.Appx. 128, 129 (5th Cir. 2008)(per curiam)(By representing its financial relationship to a client for third-party to rely on, bank assumed a duty to provide correct information); In re Succession of McKnight, 768 So.2d 794, 798 (La. App. 2d Cir. 2000)("[o]nce [b]ank assumed responsibility to instruct the decedent concerning the distribution of account funds after her death, and in effect agreed to distribute such funds to the plaintiff, the [b]ank owed a duty of reasonable care in

14

advising decedent as to the method for achieving the intended result in favor of the plaintiff"); <u>Cypress Oilfield Contractors v. McGoldrick Oil</u>, 525 So.2d 1157 (La.Ct.App. 1988)(By volunteering information that borrower was solvent to third-party, bank assumed a duty to insure that the information was correct). The Louisiana Supreme Court has instructed that it is appropriate to impose a duty as a matter of law under circumstances where the plaintiff was the intended user of the misinformation. <u>See</u> <u>Barrie v. V.P. Exterminators, Inc.</u>, 625 So.2d 1007, 1015 (La. 1993)(noting that "Louisiana's case by case development of the tort of negligent misrepresentation has been broadly used to encompass situations of non-disclosure in fiduciary relationships, to situations of direct disclosure to non-clients", and holding that termite inspector, which negligently concluded in a report submitted to the seller of a home that there was no evidence of termite infestation, owed the buyer a duty to provide accurate information); <u>see also</u> <u>Audler v. CBC Innovis Inc.</u>, 519 F.3d 239, 250 (5th Cir. 2008)(identifying the following <u>Barrie</u> factors for determining whether a duty is owed in a negligent misrepresentation case in the absence of privity or a fiduciary relationship: "whether the tortfeasor could expect that the plaintiffs would receive and rely upon the information"; "whether the plaintiffs are members of the limited group for whose benefit and guidance the [information] was...supplied"; "whether the report is prepared in the context of a business transaction for

which the alleged tortfeasor received compensation"; "whether extending tort liability would serve public policy").

The plaintiffs allege that when their father's health was declining, Mr. Rovig, acting on behalf of INVEST, unequivocally told Luke Hyatt that he and his brothers were equal beneficiaries to the Annuity's death benefit; Mr. Rovig also told Luke Hyatt that he would check that information during the next week and would let him know if any action needed to be taken or if there was cause for concern; Mr. Rovig never contacted Luke Hyatt to follow up regarding the beneficiary issue. The plaintiffs also allege that Mr. Rovig advised Luke Hyatt that his father's probate would be simpler if the funds in his late mother's account were used to pay for his father's care, before using the funds in the Annuity. In reliance on Mr. Rovig's representations and advice, Luke Hyatt made no further inquiry into the identity of the designated beneficiary, and in fact took the necessary steps to use the funds from his late mother's account for his father's care. Finally, the plaintiffs allege, when their father died, it was discovered that contrary to Mr. Rovig's representation, Mr. Hyatt's ex-wife, whom plaintiffs allege had abandoned and divorced their father, was still named as the beneficiary of the death benefit; accordingly, the Hyatt sons lost the benefit as well as the funds (since depleted) from their late mother's account. Assuming that the plaintiffs' factual allegations are true, and provable, the Court finds that they

16

plausibly give rise to an entitlement to relief based on a negligent misrepresentation, assumed duty, theory of recovery.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[2]

     With respect to the plaintiffs' "general negligence claim", that Mr. Rovig negligently failed to learn that Dr. McWilliams was the designated beneficiary and failed correct his error by advising Luke Hyatt so that the beneficiary could be changed to honor his father's wishes, the defendants contend in their reply papers that this negligence claim fails for the same reason as the negligent misrepresentation claim.  For the reasons already articulated (by application of the same duty-risk analysis), the Court disagrees.

                                   B.
   Louisiana Unfair Trade Practices and Consumer Protection Law

     The defendants next urge dismissal of the plaintiffs' claim under the Louisiana Unfair Trade Practices and Consumer Protection Law; they advance three grounds: (1) the events at issue do not

---

[2]The defendants suggest that the plaintiffs have cited no case in which the court has found a duty by an investment broker to an allegedly intended beneficiary, or, for that matter, a case in which the defendant was found to have a duty to a plaintiff who had equal or better access to the information allegedly sought"; defendants suggest that Luke Hyatt was the one who was negligent because he need "only glance at the quarterly statements [for the annuity], four of which were sent to Mr. Hyatt in Mandeville, where his sons were caring for him, during the time that Luke Hyatt was serving as [power of attorney."  This contributory negligence argument is not for the Court to address at this stage of the litigation, in which the Court is confined to addressing the technical sufficiency of the plaintiffs' allegations concerning the defendants' fault-based liability.  See La. Civ. Code art. 2323.

constitute "trade" or "commerce"; (2) the plaintiffs lack standing to bring their claim because they are neither business competitors nor consumers; and (3) the plaintiffs lack standing because they have failed to allege any actionable damages.  The Court finds that the plaintiffs, who have alleged that Mr. Rovig carelessly misinformed them that they were named beneficiaries, have failed to state a cause of action under LUTPCPL, which targets an extremely narrow range of conduct, exclusive of negligence.

The Louisiana Unfair Trade Practices and Consumer Protection Law (UTPCPL – previously and still also commonly referred to as LUTPA) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La.R.S. § 51:1405(A).  "Trade" or "commerce" is defined as:

> the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state.

La.R.S. § 51:1402(9).  The UTPCPL grants a private cause of action to "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice...."  Id. § 1409(A).

Conspicuously absent from the statute is an enumeration of the sorts of conduct that constitutes "unfair or deceptive method, act

18

or practice." This is left up to the courts, which

> have interpreted these terms to include "'a practice that
> is unethical, oppressive, unscrupulous, or substantially
> injurious,'"; fraud, misrepresentation, deception, but
> not mere negligence; acts offensive to established public
> policy and immoral, unethical, oppressive, unscrupulous,
> or substantially injurious to consumers....

Reingold v. Swiftships, Inc., 126 F.3d 645, 653 (5th Cir.

1997)(internal citations omitted). LUTPA, a penal act, calls for

strict construction; it reaches "only egregious actions involving

elements of fraud, deception, or other unethical conduct." See

Cheramie Servs. v. Shell Deepwater Prod., 35 So.3d 1053, 1060 (La.

2010). "[T]he range of prohibited practices under LUTPA is

extremely narrow." Id. As another Section of this Court has

observed, "LUTPA is concerned with intentional deception." See

Cargill, Inc. v. Degesch America, Inc., 875 F. Supp. 2d 667, 677

(E.D. La. 2012). Notably, "mere negligence" is not prohibited by

the Act. See Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th

Cir. 1993). Nor does the statute "prohibit sound business

practices, the exercise of permissible business judgment, or

appropriate free enterprise transactions." Reingold, 126 F.3d at

653 (citations omitted).[3] In applying LUTPA, the Fifth Circuit has

observed, "Louisiana courts appear to zealously guard against

---

[3]The Fifth Circuit has observed that "[t]he real thrust of the
[UTPCPL], modeled after the Federal Trade Commission Act, 15
U.S.C. § 45, is to deter injury to competition." Reingold v.
Swiftships, Inc., 126 F.3d 645, 652-53 (5th Cir. 1997)(citations
omitted).

allowing managers, employees, and persons in a special position of trust to profit from their wrongdoing." See id. (citations omitted); see also Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir. 1993)(reviewing cases decided under LUTPA and stating that LUTPA aims to punish "breaches of ethical standards arising from the employer-employee relationship")(citations omitted).

With respect to unfair trade practices, in addition to incorporating the facts pleaded in support of their negligence and negligent misrepresentation claims, the plaintiffs allege:

49.

> By acting to confirm false "facts", without checking the matters at issue and disclosing the correct and true state of affairs, to wit, communicating that the three plaintiffs were the beneficiaries of the Prudential annuity, as opposed to Dr. McWilliams, when Mr. Rovig had a clear and present conflict of interest as he had handled investments and/or insurance matters for her previously and had reason to believe that he was more likely to obtain additional investments from an existing customer, Dr. McWilliams, constituted immoral, unethical, oppressive, unscrupulous, and/or substantially injurious conduct.  The failure to follow through and confirm as had been promised in the telephone call to the undersigned, represents a failure of business honesty, which is a key consideration in a LUTPA claim.

50.

> Mr. Rovig's conduct, as described above, constituted an unfair trade practice in violation of [LUTPA]....

Even accepting the factual allegations underpinning the plaintiffs' LUTPA claim as true, the Court finds that the allegations fall far short of stating a plausible claim for relief.  It is undisputed that the character of plaintiffs' fault-based claims sound in negligence, not intentional misconduct on the part of Mr. Rovig.

20

Nowhere do plaintiffs allege facts that would permit the inference that Mr. Rovig intentionally duped the plaintiffs as to the identity of the designated death benefit beneficiary,[4] or otherwise engaged in the sort of egregious conduct that LUTPA targets.

III.

A.

"Arbitration is a matter of contract between parties, and a court cannot compel a party to arbitrate a dispute unless the court determines the parties agreed to arbitrate the dispute in question." Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1064 (5th Cir. 1998).  Courts must perform a two-step inquiry to determine whether to compel a party to arbitrate. Dealer Computer Servs., Inc. v. Old Colony Motors, Inc., 588 F.3d 884, 886 (5th Cir. 2009).  First, the Court must determine whether the parties agreed to arbitrate the dispute.  Id.  Second, once the Court finds that the parties agreed to arbitrate, it must determine whether any applicable federal statute or policy renders the claims nonarbitrable.  Id.  When addressing the first question, there are two considerations:  whether a valid agreement to arbitrate exists and whether the dispute falls within that agreement.  Id.; see also Will-Drill Res., Inc. v. Samson Res. Co., 352 F.3d 211, 214 (5th

---

[4]To the contrary, plaintiffs allege that, when he realized after Mr. Hyatt died that the Hyatt sons were not the named beneficiaries, Mr. Rovig undertook to convince Dr. McWilliams to disclaim the death benefit.

Cir. 2003).  "Beyond this analysis, the courts generally do not delve further into the substance of the parties' disputes."  Id.

Plaintiffs are not parties to an arbitration agreement regarding these defendants.  Only their father was.  If a valid agreement to arbitrate does not exist, there are nevertheless limited circumstances in which a nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate in accordance with that clause.  See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir. (2003) ("[F]ederal courts have held that so long as there is some written agreement to arbitrate, a third party may be bound to submit to arbitration."); id. at 358 ("Arbitration agreements apply to nonsignatories only in rare circumstances.")(citing Westmoreland v. Sadoux, 299 F.3d 462, 465 (5th Cir. 2002)).  The Fifth Circuit has recognized six theories for binding a nonsignatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third-party beneficiary.  Id. at 356 (citing Thompson-C.S.F., S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995); E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195-97 (3d Cir. 2001)).

*B.*

Conceding that most of these theories are inapplicable here, the defendants invoke only the sixth, the third-party beneficiary,

theory to compel the plaintiffs, nonsignatories to defendants' agreement with the late Mr. Hyatt to arbitrate his claims arising out of the Annuity.  The plaintiffs counter, correctly, that the third-party beneficiary doctrine is not applicable and that this is not one of the rare cases in which nonsignatories should be bound by an arbitration agreement.

The defendants contend that the plaintiffs advance the theory that they are the intended beneficiaries of the Annuity based on alleged communications between Mr. Rovig and Luke Hyatt, acting as power of attorney for Mr. Hyatt.  These communications took place, defendants argue, as a result of the contract between INVEST and the late Mr. Hyatt; the contract through which Mr. Hyatt purchased the Annuity.  When Mr. Hyatt contracted with INVEST, he agreed to arbitrate any disputes.  Defendants submit that plaintiffs wish to extend to themselves any duties owed to their father; duties that arise only through the contract.  If plaintiffs seek the benefit of the contract, the defendants insist, they must also accept all aspects of that relationship, including the arbitration clause.

But the following facts are critical to a finding that arbitration is not proper here: (1) none of the plaintiffs signed the arbitration agreement; (2) the arbitration agreement the defendants seek to enforce does not specify that it is intended to be binding on third-party beneficiaries, but, instead, refers only to binding the parties to the contract; (3) the plaintiffs have

pursued only claims arising under Louisiana tort law; they do not allege breach of contract; (4) the plaintiffs allege that Mr. Rovig gave direct advice, information, and offers of service through communication that went beyond the scope of INVEST's contract with the late Mr. Hyatt and beyond Rovig's role as INVEST's agent servicing the investment contract by (a) giving advice intending to make probate easier by depleting the remaining assets in the plaintiffs' late mother's estate, (b) misrepresenting that the plaintiffs were the beneficiaries of the death benefit, and offering to advise them on how to invest their respective shares, (c) attempting to correct the beneficiary designation and convince Dr. McWilliams to disclaim the death benefit; (5) until this litigation, the plaintiffs did not have actual knowledge of the arbitration agreement; and (6) the only role that the contract plays in this litigation is a "but for" role, which has been held to be insufficient to bind nonsignatories.

Turning to the third-party beneficiary doctrine, it is clear that it does not apply under the circumstances presented here.  It is not enough that the plaintiffs may have benefitted from the existence of their father's contract with INVEST.  See Bridas, 345 F.3d at 362:

> Under the third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed.  Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed.  Thus, the snapshot [the court] examines under equitable estoppel is much later in time

24

than the snapshot for the third party beneficiary
analysis.

Bridas, 345 F.3d at 362 (quoting DuPont, 269 F.3d at 200 n.7).
"[T]he fact that a person is directly affected by the parties'
conduct, or that he may have a substantial interest in a contract's
enforcement, does not make him a third-party beneficiary." Id.
(quoting DuPont, 269 F.3d at 200 n.7). Further, "[p]arties are
presumed to be contracting for themselves only. . . . This
presumption may be overcome only if the intent to make someone a
third-party beneficiary is clearly written or evidenced in the
contract." Id. (citations and internal quotation marks omitted).
Given the relationship of the parties, the nature of the tort
claims asserted, and the allegations that Mr. Rovig assumed duties
to plaintiffs beyond the contract between INVEST and the late Mr.
Hyatt, the Court finds that the arbitration provision fails to
point to a clear intent to benefit the plaintiffs. Moreover, the
Fifth Circuit has expressed reluctance in binding a nonsignatory
under the third-party beneficiary theory when the nonsignatory
never filed a claim against the signatory premised upon the
agreement, or otherwise sought to enforce its terms. Id. (citing
DuPont, 269 F.3d at 192; Indus. Elec. Corp. of Wis. v. iPower
Distribution Grp., Inc., 215 F.3d 677 (7th Cir. 2000); TAAG Linhas
Aereas de Angola v. Transamerica Airlines, Inc., 915 F.2d 1351,
1354 (9th Cir. 1990)). As the plaintiffs point out, they are the
masters of their pleadings, and they have not raised any breach of

contract claims and they do not seek enforcement of their father's contract with INVEST.  The plaintiffs are not bound under this theory -- this is simply not one of the rare cases in which nonsignatories should be compelled to arbitrate their claims.

Accordingly, IT IS ORDERED: that the defendants' motion to dismiss is GRANTED in part (insofar as they requested dismissal of the plaintiffs' unfair trade practices claim and insofar as they requested, and plaintiffs conceded to, dismissal of the plaintiffs' claim against Jackson National Life Insurance Company), and DENIED in part (insofar as the defendants requested dismissal of the plaintiffs' negligence and negligent misrepresentation claims).  IT IS FURTHER ORDERED: that the defendants' alternative request to stay and compel arbitration is DENIED.  The plaintiffs' claims against Jackson National Life Insurance Company are hereby dismissed, and their unfair trade practices claim against Rovig and INVEST is also dismissed. The negligence and negligent misrepresentation claims survive.

New Orleans, Louisiana, March 12, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE